ROBERT CORNELIUS, Plaintiff, *v.* HARRY L. BERINSTEIN et al., Doing Business under the Name of SYRACUSE BOWLING CENTER, Defendants.

Supreme Court, Onondaga County, August 29, 1944.

*Donald Mawhinney* and *Gerald H. Henley* for plaintiff.

*Raymond M. Bush* and *J. Norman Crannage* for defendants.

SEARL, J. Defendants operate bowling alleys in Syracuse, Utica and Binghamton. The building at Syracuse is known as Syracuse Bowling Center and contains 32 alleys, with 3 locker rooms containing 333 lockers, wash rooms and luncheonette, all upon one floor.

The complaint alleges that on September 7, 1943, defendants " rented to the plaintiff and to Andrew Bronner, for the length of the bowling season which started on September 7, 1943, and was to finish in the spring of 1944, locker No. 511 ", for the sum of one dollar and fifty cents. Further, the complaint alleges that on December 14, 1943, plaintiff left a bowling ball, bag and a pair of bowling shoes in the locker, and that when plaintiff opened the locker on December 21, 1943, the articles " were not there ". Request of the defendants " to redeliver said merchandise " is alleged; that defendants " did not take due care of or safely keep said goods for plaintiff," that " through the carelessness and negligence of the defendants the goods were stolen * * *."

Upon the trial of the action the evidence disclosed that the locker in question was of steel construction, six feet six inches in height, having a shelf and three hooks upon which to hang clothing, a handle on the outside of the door, with a keyhole in the handle. A quarter turn of the handle served to latch or unlatch the door. The handle was in the same position when the latch was caught, regardless of whether the key had been used and the locker actually locked. The lockers were rented to one or two persons, but there were only two keys for each locker. A deposit of twenty-five cents per key was required.

The case was tried on the theory of bailment. After offering proof of the rental, that neither plaintiff nor Bronner had loaned their keys to others, the disappearance and value of the merchandise, followed by demand for return thereof, the plaintiff rested, without any proof of negligence on the part of defendants. Motion for a nonsuit was made and the court reserved decision. Defendants offered evidence and the plaintiff offered rebuttal evidence. Motion for a nonsuit was again made at the close of the evidence and decision thereon again reserved. The jury returned a verdict of $15 for plaintiff.

The question now before the court is whether a nonsuit should have been granted. If the facts constitute a relation of bailor and bailee, then a prima facie case was made out and the defendant under the well-established law of this State would be called upon to offer proof, had not the plaintiff alleged in his complaint that the " goods were stolen ". He alleged the cause of the loss. If we examine the much cited case of *Claflin et al.* v. *Meyer*, (75 N. Y. 260) which has not been overruled we find the rule well defined in the following language " but if, either in the course of his proof or that of the defendant, it appears that the goods have been lost by theft, the evidence must show that the loss arose from the negligence of the warehouseman."

In the instant case, plaintiff's counsel urge that the same rule is applicable as prevails where articles are stolen or disappear from a safe deposit box at a bank or other fiduciary institution.

To obtain a proper perspective let us trace briefly the development of the law of bailments, as no authority directly in point is available in this State. Justice SEABURY in *Wentworth* v. *Riggs* (159 App. Div. 899) refers to the opinion of Chief Justice HOLT in *Coggs* v. *Bernard* (2 Ld. Raym. 909) as having laid the foundations of the English Law of bailment and carrying with it the necessity for the " delivery " of property. Likewise the definitions of Blackstone and Story apparently required a " delivery ". Kent's definition (2 Kent's Commentaries, [14th ed.], p. 558) is " a delivery of goods in trust, upon a contract, expressed or implied, that the trust shall be duly executed, and the goods restored by the bailee, as soon as the purpose of the bailment shall be answered." Later judicial interpretation broadened the " delivery " into " possession ", or " sole custodian ". (5 Cyc. 165.) As was said in *Pattison* v. *Hammerstein* (17 Misc. 375, 376) " A bailment implies the delivery of a chattel; and to subject one to liability as a bailee it is a constituent that he had voluntarily assumed or retained the custody of the chattel alleged to have been bailed." American Jurisprudence (Vol. 6, Bailments, § 27, p. 154) referring to " possession ", states: " Moreover, it is a generally recognized feature of bailments that possession of the thing bailed is severed from ownership; the bailor retains the general ownership, while the bailee has the lawful possession or custody for the specific purpose of the bailment." (Also, see *Eklof* v. *Waterston*, 132 Ore. 479.)

We are now confronted with the question if the relationship between the plaintiff with his partner Bronner and Syracuse Bowling Center is not that of bailor and bailee, then what is the relationship? As alleged in the complaint the Bowling Center "rented" to the plaintiff an empty steel locker, in which plaintiff would presumably lock his clothes or equipment, but in which he might place any type or kind of personal property, of which the defendants had no knowledge, and no semblance of custody, possession or control. Either the plaintiff or Bronner could lend the locker key to any friend or acquaintance and the defendants could in no way question the right of entrance either to the locker room or to the locker itself. Plaintiff might leave his locker unlocked and the position of the handle would be the same as though it were locked. To the court the relationship would seem almost identical in principle to any large apartment house when the outer door was unlocked and when the tenant might hand his apartment key to any of his friends for entrance. In such instance the landlord would have no authority to question the right of entrance to one holding the tenant's key. With 333 lockers at defendants' place of business, the question of identity would be even more difficult of ascertainment. Should an apartment house tenant, under similar circumstances, find an article of personal property missing, there would be no liability on the part of the landlord. Such an illustration finds support under the subject "Bailment or Landlord and Tenant," (6 Am. Jur., Bailments, § 59, p. 188): "On the other hand, if there is no such delivery and relinquishment of exclusive possession, and his control and dominion over the goods is dependent in no degree upon the co-operation of the owner of the premises, and his access thereto is in no wise subject to the latter's control, it is generally held that he is a tenant or lessee of the space upon the premises where the goods are left."

Plaintiff urges that the relationship in the instant case is similar to that existing between a bank or safe deposit company and a customer renting a safe deposit box, citing *Roberts* v. *S. S. D. Co.* (123 N. Y. 57) and *Carples* v. *Cumberland Coal & Iron Co.* (240 N. Y. 187). Judge HISCOCK, writing for the court in the latter case, throws some light on the relationship when he states: "While the status of the Safe Deposit Company is, therefore, in some aspects that of a bailee, the customer's control and possession of his box is *not much different* than would be the control and possession by a tenant of property in an office which he had rented from the owner of the building." (Italics inserted.)

The quality of the difference above referred to is exactly the difference we find in the instant case. Concededly, the common practice adopted by safe deposit institutions is that the customer or his duly authorized attorney in fact must sign an identification card in order to be granted access to the safe deposit department. Then the custodian must insert a key and unlock a release lock to enable the customer in turn to insert his key and complete the unlocking of the box. (*McDonald* v. *Perkins and Co.*, 133 Wash. 622.) The customer enjoys only partial control, subject to the initial control of the custodian. In the instant case the facts tend much stronger toward the relationship of landlord and tenant than do the facts related by Judge Hiscock in the case of *Carples* v. *Cumberland Coal & Iron Co.* (*supra*).

Plaintiff also cites *Port of Seattle* v. *Luketa* (12 Wn. [2d] 439, 442). There the defendant occupied two locker rooms for the storage of fish nets and gear. Defendant had the keys to the locker rooms and exclusive possession. At the termination of the rental period defendant refused to vacate and plaintiff brought action in unlawful detainer. This action followed one previously tried, entitled *Luketa* v. *Port of Seattle* (186 Wash. 609) in which the then plaintiff procured a judgment against the Port of Seattle for negligence, where there was proof of defendant's agent breaking into and removing plaintiff's merchandise. In the second action, cited by instant plaintiff, judgment was rendered against Port of Seattle because of the existence of a statute of the State of Washington defining the term " storage warehouse ", and further providing that no warehouseman should grant any undue preference to any " person, corporation or locality ". The court held Port of Seattle " guilty of unlawful discrimination ", stating that the wording of the statute " creates a relationship more akin to that of bailor and bailee." The significant portion of the opinion in this case cited by plaintiff is the expression " It [Port of Seattle] had no specific knowledge of what was stored in them. The appellant was free to store and remove her nets and gear without let or hindrance by respondent. Such an arrangement — where an occupant of a locker room has exclusive possession and the warehouseman does not have control or possession of the goods stored — has been held to create the relationship of landlord and tenant between the parties. *Bash* v. *Reading Cold Storage & Ice Co.*, 100 Pa. Super. Ct. 359."

Referring to the last above-cited case, it appears that plaintiff, a dealer in furs, rented a room in defendant's cold storage

warehouse, plaintiff retaining the key " so that he had access at all times to the room without in any way obtaining permission from the defendant, except that it was necessary for him to use the main entrance of defendant's building which was open during business hours ", this situation being similar to that in the case at bar. Certain liquid came through the ceiling damaging plaintiff's merchandise. Plaintiff brought action, claiming that the contract was one of bailment and upon the trial offered no proof of negligence, claiming that a prima facie case of negligence had been made out. Both the trial and appellate courts held the relationship of landlord and tenant existed and a nonsuit was granted.

In this Pennsylvania case, as indicated in the opinion, the plaintiff relied upon *Jones* v. *Morgan* (90 N. Y. 4) cited by plaintiff in the case at bar. The distinguishing feature in the *Morgan* case, as pointed out in the Pennsylvania case, is that the plaintiff, Jones, relied upon a contract to effect that the goods " would be under the guard of a watchman by day and a responsible man by night."

In the instant case the defendants held a master key for all lockers, but the necessity therefor was shown by the fact that lockers were rented for the bowling season, that in many instances the occupant for one season would not reappear the following season and it would therefore be necessary to open the locker at that time for rental to someone else.

After collating all available authorities on the subject the court is convinced that defendants' motion for a nonsuit should be granted. To hold otherwise would be tantamount to holding that the defendants were insurers of property that never came into defendants' possession, actually or constructively. There was no proof of negligence in the case. The testimony of plaintiff's witnesses permitted to testify in rebuttal to the effect that one or more of them had found their locker unlocked or goods missing cannot be interpreted as constituting negligence. In one instance a duplicate key was held by an absent soldier who might well have loaned his key to a friend to use the locker in his absence. Were a nonsuit to be denied this court would be compelled to set aside the verdict as against the weight of evidence as to negligence on the part of defendants.

Order accordingly.