LOUISE A. RAUCH, Plaintiff, *v.* MOSSBERG GARAGE CORPORATION, Defendant.

Municipal Court of the City of New York, Borough of Manhattan, November 25, 1947.

*Charles E. Powers* for plaintiff.

*Sol A. Herzog* for defendant.

MARKS, J. Plaintiff, who stored her passenger automobile in the public garage operated by defendant, brings this action to recover the sum of $76. Of this amount $12.75 is claimed to be the excess over and above the sum of $12.65 alleged to be the maximum amount that may be charged by defendant for each month for the months of December, 1946, to April, 1947, inclusive, and $63.25 is claimed by plaintiff as a forfeit or penalty of one month's payment for each of the five months herein-before mentioned.

The action is based upon the contention that plaintiff, as one who stores or garages an automobile, is entitled to the protection of the provisions of chapter 3 of the Laws of 1945 of the State of New York, as amended, commonly called " the Commercial Rent Law."

After the joinder of issue, the parties submitted the controversy to this court for decision upon an agreed statement of facts, pursuant to section 124 of the Municipal Court Code of the City of New York (L. 1915, ch. 279). Under the facts as stipulated, the issue is clear cut.

It is agreed that since 1939, the defendant stored and garaged plaintiff's passenger automobile and that defendant could and did place plaintiff's automobile any place in its garage; that plaintiff drove her car to the entrance or curb out in front of defendant's garage from which place it was taken by defendant's employees and placed in the garage, and when plaintiff desired her automobile defendant was notified and defendant caused said automobile to be brought to the street curb outside of defendant's garage, from which place plaintiff took possession of the automobile; that defendant, while plaintiff's automobile was in its garage, from time to time rendered certain cleaning services to the interior and exterior of plaintiff's automobile; that at plaintiff's request other services such as washing, polishing, winterizing were performed by defendant, billed to plaintiff by defendant, and paid for by plaintiff; that in 1939, plaintiff paid $9 per month for such services and storage, and that the rates were increased from time to time until April, 1947, when the charge was $16 per month. It is also agreed that at no time was there set aside or assigned to plaintiff for the storage of her automobile any specific space or location in the garage of defendant, and that at no time did the plaintiff have any control, responsibility, or dominion over defendant's garage or any space or location therein.

Where the relationship between the garage operator and the owner or person entitled to the possession of the premises is that of landlord and tenant, it must be conceded that the law is intended to apply. The use of the term " garaging " in the law itself then becomes quite obvious. Whether this application is to be extended to include a relationship between the garage operator and his customer as set forth in the agreed statement of facts is the question here to be decided. An examination of the act itself and the legislative declarations as well as the findings of the legislative committees preliminary to the enactment of the act will help to decide this question.

The preamble to the law recites that " Unjust, unreasonable and oppressive leases and agreements for the payment of rent for commercial space in certain cities having been and being now exacted by landlords from tenants * * * " (Commercial Rent Law, § 1) and there then follows a recital of certain con-

sequences, to wit: " * * * there have come into existence conditions threatening to obstruct the production and distribution of essential civilian commodities, and to cause inflation, and all of the foregoing situations and conditions being a threat to essential civilian activities, and to the public safety, health, and general welfare of the people of the State of New York * * * ."

Nowhere in the act itself is there any reference to the relationship existing between the garage operator and the person who stores an automobile in the garage. Nowhere in the act or in the findings of the legislative committee is there any reference to the relationship existing between garage operator and automobile owner, or facts indicating that the situation present would in any way affect the public health, safety, or general welfare of the people of the City of New York or that the existing conditions in the garage industry would threaten to obstruct the production and distribution of essential civilian commodities or cause inflation. Since the findings of the committee undoubtedly were the basis for the enactment of the act, we must look to these findings for the normal intent of the act itself.

In the report of the New York State Joint Legislative Committee to Inquire into and Study Commercial Rents in New York City (N. Y. Legis. Doc., 1945, No. 2) at page 11, we note in the findings the following: " It has been found by the Committee that, because of war conditions and the suspension of building construction there is a serious shortage of premises adapted for manufacturing and merchandising purposes. Moreover, in portions of the City of New York which are heavily tenanted by substantial merchandise establishments, there exists a similar scarcity of space suitable for use as stores. As a result a breakdown has taken place in the normal processes of bargaining for leases between landlords and tenants of buildings falling within these two categories. Knowing that their tenants cannot obtain space elsewhere, a considerable number of these landlords are demanding, and in many instances have obtained, exorbitant and unjust and unreasonable increases of rent when approached by their tenants for a renewal of existing leases. These demands are in many cases coupled with an insistence that the tenant sign a lease providing for a substantially longer term than that of the current rental agreement and with a reduction of services previously given. In these cases, the landlord's terms are peremptorily submitted to the tenant in ultimatum form, and the latter knows

that he must acquiesce or go out of business. As between landlords and tenants in this situation, freedom of contract has become an illusory concept."

It is thus seen that there was not the slightest indication that the committee had in mind the situation here presented. In its recommendation (Report, p. 19), the committee recommended that contemplated legislation should contain provisions: "1. Restricting its application to space occupied for manufacturing and other merchandising purposes or as a store in cities having a population of one million or more   *   *   *."

Subsequent to the enactment of the original Commercial Rent Law the legislative committee continued its investigations. In the Report of the New York State Joint Legislative Committee to Study Rents to the Legislature dated March 20, 1946 (N. Y. Legis. Doc., 1946, No. 46) at page 12, we find this statement: "The Committee staff has engaged in making an active check on the operation of the emergency laws. Constant investigations have been made of landlord-tenant relationships. As a result of such examinations and a study of judicial interpretations, minor imperfections have been noted which require correction."

It is interesting to note that the corrections noted did not include any reference to a situation as here presented.

From all the investigations, findings, and reports made by the committee the conclusion is clearly drawn that there was never any intent on the part of the Legislature to do anything but to control the relationship between a landlord and tenant in respect to the use or occupancy of certain types of real property by such tenant.

Plaintiff attempts to place herself in the category and class of a tenant, first, by claiming that the consideration paid by her for the services rendered by the defendant comes within the statutory definition of the word "rent" and, secondly, by reference to the case of *Shepard Warehouses, Inc.*, v. *Scherman* (63 N. Y. S. 2d 421) decided by Mr. Justice EDER in the Supreme Court, New York County. I do not agree with the contention of plaintiff that the consideration or charge paid by plaintiff comes within the definition of the word "rent" as defined in the statute. A reading of the opinion of the learned Justice in the *Shepard Warehouses, Inc.*, case (*supra*) convinces me that the decision of the court in that case was based upon the finding that the plaintiff was a licensee because of its particular agreement with the garage and as such was entitled to continue in possession. However, the essential fact

in the *Shepard* case which, in my opinion, distinguishes it sharply from the case at bar is that the written agreement between the parties in the *Shepard* case allotted to plaintiff a specific space or location in the garage premises to be used as a shop. The statement of the learned Justice that " * * * the fact that no particular or definite space has been agreed upon and allotted " is of no significance (p. 426) and seems to be at variance with some of the facts, and, at best, is but obiter dictum and was not essential to a determination of that matter.

In the case. of *Kaypar Corp.* v. *Fosterport Realty Corp.* (69 N. Y. S. 2d 313) defendant, owner of certain premises, leased to plaintiff for a period of three years, cancelable by either party on thirty days' notice, certain space in its building for installing and maintaining certain laundry equipment for a percentage of the gross income. Plaintiff resisted removal from the premises after defendant gave notice of cancellation, on the ground that its use and occupancy were protected by the Commercial Rent Law. In writing the opinion Mr. Justice KOCH found that the allowance of space for the machines was but a part of the over-all license granted to plaintiff and that the space allotted was not commercial space in the purview of the law, and, further, it was stated (pp. 318, 319): " It seems perfectly apparent that the intention of the Emergency Rent Control Law is to protect possession of space and not to protect a license to do certain acts on real property " and, further, " The purpose of the Commercial and Business Rent Control Laws was the protection of those engaged in business against what might very well be.their losing their means of livelihood,— the place in which they conduct their business — or, at least, being compelled to pay such an amount in rent as would make it impossible to profitably conduct their business. The facts here present no such situation."

This opinion has been cited with approval and followed in *Schaefer* v. *Lubarsky* (N. Y. L. J., May 9, 1947, p. 1828, col. 5) by Mr. Justice LEVY, Special Term, Bronx County, Part I, and by Mr. Justice MILLER in *United Meter Laundry Corp.* v. *Almsol Realty Corp.* (N. Y. L. J., May 13, 1947, p. 1878, col. 2) sitting at Special Term, Part III, New York County.

In the case of *Esposito* v. *285 St. John's Place, Inc.* (68 N. Y. S. 2d 18) where an operator of a public garage surrendered its lease to the owner of the property, who had decided to renovate the premises for another use, an action was brought for a declaratory judgment and for a temporary injunction to

restrain the closing of the garage. Mr. Justice WALSH, sitting at Special Term, Kings County, denied the motion. He held that the relationship between plaintiff and the garage " was that of bailor and bailee " (p. 21), and characterized the situation before him as nothing " more than the common public garage automobile storage transaction." Referring to the *Shepard* case (*supra*), Justice WALSH stated that he disagreed with that case to the extent that it might hold that the storage of trucks comes under the Commercial Rent Law.

It is again interesting to note that although these cases were decided before the report of the New York State Joint Legislative Committee to Study Rents was made to the 1947 Legislature, and the committee reached the conclusion that only a limited number of amendments need be recommended, no attempt was made to implement and buttress the language of the law in order to express more clearly the intendment of the Legislature, to include any reference to a relationship between garage operator and one who stores his automobile in a public garage. The many service factors entering into the relationship between the plaintiff and defendant in this case preclude a landlord-tenant relationship so as to entitle the plaintiff to come within the protection of the so-called Commercial Rent Law.

The arrangement between the plaintiff and this defendant is that of bailor and bailee. This arrangement has received statutory recognition. Section 184 of the Lien Law of the State of New York, as amended, provides that " A person keeping a garage, * * * for the storage, maintenance, keeping or repair of motor vehicles * * * who in connection therewith stores, maintains, keeps or repairs any motor vehicle * * * has a lien upon such motor vehicle * * * for the sum due for such storing, maintaining, keeping, or repairing of such motor vehicle * * * and may detain such motor vehicle * * * until such sum is paid * * *."

The authorities are numerous to the effect that the agreement and arrangement between plaintiff and defendant makes defendant a bailee for hire. (See *Osborn* v. *Cline*, 263 N. Y. 434; *Hogan* v. *O'Brien*, 212 App. Div. 193; *Galowitz* v. *Magner*, 208 App. Div. 6.)

The Federal Government recognized the storage of automotive vehicles as falling within the category of services. In Maximum Price Regulation No. 165, as amended August 13, 1942 (7 Federal Register 6428) issued pursuant to the provisions (§ 2, subd. [a]; § 302, subd. [c]) of the Emergency Price

Control Act of 1942 (U. S. Code, tit. 50, Appendix, § 902, subd. [a]; § 942, subd. [c]), the storage of automobiles was included as a service. This regulation was passed upon by the United States Emergency Court of Appeals in *Carothers* v. *Bowles* (148 F. 2d 554, certiorari denied 325 U. S. 875). The court in that case said pp. 556–557): " It may be conceded that one who merely rents a piece of ground to the owner of an automobile in order that the latter may store his car upon it, without more, is not engaged in rendering a storage service within the meaning of the Act, but is merely engaged in the renting of real estate. On the other hand one who operates a closed and heated garage for the storage of automobiles and who provides attendants to take charge of the cars stored therein is clearly engaged in supplying automobile storage service within the meaning of the Act."

An examination of the law upon which plaintiff relies shows that the provisions all relate to the usual landlord-tenant relationship, with rights and remedies afforded to both landlord and tenant which do not fit in, or have they any application to the bailor-bailee relationship existing between a garage operator and his customer. The Legislature would not have left to inference a relationship involving as it does so many hundreds of thousands of car owners had it intended to include them in the provisions of this law. This omission to include this large group must be considered as deliberate on the part of the Legislature, and the conclusion must be arrived at that it was never intended that the protective provisions of chapter 3 of the Laws of 1945, as amended, should apply to the plaintiff in this case or to those who find themselves in a similar situation.

Upon the facts as submitted and agreed upon, and the law, I find that the defendant is entitled to judgment dismissing the complaint upon the merits, and the clerk of this court is directed to enter judgment accordingly.